## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER MONTGOMERY | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| POLICE OFFICER | : | |
| DAVID KILLINGSWORTH | : | NO.  13cv256 |

| | | |
|---|---|---|
| ALEXINE FLECK | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| POLICE OFFICER ALEX NICHOLSON | : | |
| | : | |
| and | : | |
| | : | |
| POLICE OFFICER JANE DOE | : | NO.  13cv3081 |

| | | |
|---|---|---|
| COULTER LOEB | : | CIVIL ACTION |
| | : | |
| vs. | : | |
| | : | |
| POLICE OFFICER | : | |
| GEORGE J. GASPAR, JR. | : | NO.  13cv3082 |

## MEMORANDUM

YOHN, J.                                                    January 21, 2015

Christopher Montgomery, Alexine Fleck, and Coulter Loeb were all arrested in 2011 for separate incidents arising from their interactions at different times and places with Philadelphia police officers.  Montgomery alleges that Officer David Killingsworth arrested him in retaliation for filming Killingsworth and other officers as they arrested people on a public street outside a Wendy's restaurant.  Fleck claims that Officer Alex Nicholson and Officer Jane Doe arrested her for objecting to Nicholson's treatment of an intoxicated man sitting on a stoop on her street.  And

1

Loeb contends that Officer George Gaspar arrested him for photographing Gaspar as he escorted a woman from a public park.  They each filed separate § 1983 lawsuits against their respective arresting officers, also naming the City of Philadelphia as a defendant.

Against the individual defendants, Montgomery, Fleck, and Loeb brought claims of First Amendment retaliation and Fourth Amendment malicious prosecution, false arrest, and false imprisonment.  Additionally, Montgomery asserted a Fourth Amendment illegal search and seizure claim, and Fleck a Fourteenth Amendment excessive force claim.[1]

Although filed individually, these lawsuits were consolidated for discovery and summary judgment purposes.  Killingsworth, Nicholson, Doe, and Gaspar filed a joint motion for partial summary judgment, asserting qualified immunity on the First Amendment retaliation claims. The court will deny Nicholson and Doe's motion based on qualified immunity, for Fleck has alleged enough facts to show that they violated her clearly established constitutional right when they arrested her.  But the court will grant summary judgment to Killingsworth and Gaspar, finding that the constitutional right asserted by Montgomery and Loeb was not clearly established in 2011.

Killingsworth, Nicholson, Doe, and Gaspar did not move for summary judgment on the Fourth and Fourteenth Amendment claims and concede there are genuine issues of material fact with reference to those claims.

---

[1] Montgomery, Fleck, and Loeb also brought these claims against the City of Philadelphia, alleging a custom, pattern, or policy that caused Killingsworth, Nicholson, Doe, and Gaspar to violate their constitutional rights.  On September 5, 2014, however, the parties stipulated to the dismissal of all claims against the City of Philadelphia, leaving only the claims against Killingsworth, Nicholson, Doe and Gaspar.

# I.     Factual Background[2]

## A.     Arrest of Christopher Montgomery

On January 23, 2011, Christopher Montgomery, a Temple University student, was waiting for friends on the corner of 15th and Market streets in Philadelphia. Montgomery Dep. 7:6–14, 16:10–20, Jan. 8, 2014. He was with one friend already, and they planned to head to TGI Friday's for a birthday party once the others arrived. *Id.* at 16:19–24, 18:2–7. While waiting on the corner, Montgomery saw several young people following a man as they all emerged from the subway, taunting him as he walked. *Id.* at 17:4–7. As they proceeded down the block, the man accused them of stealing his cigarettes and told them he was calling the police. *Id.* at 17:8–10.

Around that time, Montgomery received a phone call from a friend who told him that he and the others were running late. *Id.* at 17:11–14. Knowing he had more time to wait, Montgomery started to follow the young people as they walked south on 15th Street toward a Wendy's restaurant located at 15th and Chestnut streets. *Id.* at 17:14–16, 19:15–20, 21:13–15. The police then arrived at the Wendy's, prompting Montgomery to continue walking toward it. *Id.* at 24:13–20. As Montgomery arrived at 15th and Chestnut, he saw the police coming out of the Wendy's with some people in tow and apparently arresting them outside. *Id.* at 25:17–26:1.

Montgomery then moved west on Chestnut Street toward 16th Street and began filming the police activity on his iPhone from about fifteen to twenty feet from the Wendy's front entrance. *Id.* at 27:19–29:15, 36:15–17. While he was filming the scene, a crowd formed near the front entrance of Wendy's, and a police officer directed the crowd to back up. *Id.* at 31:16–

---

[2] The plaintiffs and defendants tell conflicting versions of certain events leading to the arrests. For summary judgment purposes, the court views the facts in the light most favorable to the nonmoving parties, which means in qualified immunity cases that the court "adopt[s] . . . the plaintiff[s'] version[s] of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Where necessary in the subsequent discussion, however, the court describes any genuine disputes of material fact.

21, 33:19–34:11.  About a minute later, Officer David Killingsworth approached Montgomery, instructing him to stop recording.  *Id.* at 34:15–22, 37:3–5.  After again telling Montgomery to put away his phone, Killingsworth grabbed Montgomery's hand that was holding his phone, and Montgomery tried to pull his hand away from Killingsworth's grip.  *Id.* at 37:24–38:21. Killingsworth then forced Montgomery's hands behind his back, one of which still clutched his phone, and led him to a police car.  *Id.* at 38:12–40:1.  There, Killingsworth wrestled the phone away from Montgomery by twisting his wrist until he released it and also proceeded to search Montgomery's pockets.  *Id.* at 39:23–41:24.

Following this search, Killingsworth handcuffed Montgomery and placed him in another police car up the street from the car where he first took Montgomery.  *Id.* at 42:19–43:10. Killingsworth then drove him to the police station, where Montgomery's possessions, which included his phone, were inventoried, and he was placed in a cell.  *Id.* at 44:16–46:2.  While Montgomery was detained there, his iPhone was searched and video from it deleted.  *Id.* at 13:16–15:16; Jason Silva Expert Report ¶¶ 9–16, May 9, 2014.  Roughly forty-five minutes later, Killingsworth took him from the cell, sat him next to a computer, issued him a citation for disorderly conduct, and released him.  Montgomery Dep. 46:3–23.  He was later found guilty after a trial in Philadelphia Community Court.  *Id.* at 47:20–22.  Montgomery appealed that verdict and, on March 31, 2011, was found not guilty after a de novo trial in the Philadelphia Court of Common Pleas.  *Id.* at 47:23–48:1; Montgomery Compl. ¶¶ 28–30.

### B.  Arrest of Alexine Fleck

On June 15, 2011, Alexine Fleck, a college professor, was walking to work when she saw Officer Alex Nicholson leaning over a man sitting on a stoop who was slumped over and barely conscious.  Fleck Dep. 34:23–36:1, Jan. 7, 2014.  Nicholson had his baton drawn and was

aggressively pointing it at the man. *Id.* at 35:20–24, 37:18–38:5. Fleck, who had previous experience working with drug addicts, had talked to this man earlier in the day, at which time she saw a capped syringe between his legs and determined that he was under the influence of drugs. *Id.* at 40:6–41:2. Concerned about the way Nicholson was treating the man, she stopped to ask Nicholson if everything was all right and if he wanted her to dispose of the syringe. *Id.* at 46:15–47:19.

Nicholson rebuffed her offer, asking her why she even cared. *Id.* at 50:1–21. Fleck told him that she lived in the neighborhood and was worried about the man. *Id.* at 51:3–5. In response, Nicholson instructed her to step back, which she did. *Id.* at 51:14–18. He told her to step back again—this time ten steps—and she complied. *Id.* at 51:19–52:9. After she had stepped away, Nicholson again asked her why she cared, and she reiterated her concern for the man. *Id.* at 52:16–24. Fleck then told Nicholson that she was going to observe him and asked for his name and badge number. *Id.* at 53:3–8. Nicholson told her that she would have to wait for that information, and she verbally agreed to wait. *Id.* at 53:8–9. Immediately thereafter, Nicholson told her to leave, but she refused, telling him that she was permitted to stand on the sidewalk. *Id.* at 53:10–11. She felt that her presence could deter Nicholson from harming the man so she remained on the scene, standing away from Nicholson. *Id.* at 53:12–54:11.

At that point, a female officer arrived. *Id.* at 56:20–57:5. This officer has thus far been designated only as Jane Doe. After first talking with Nicholson, Doe walked over to Fleck and asked her what had happened. *Id.* at 57:1–58:2. Fleck told Doe, and Doe, like Nicholson, asked why she cared. *Id.* at 58:1–5. Doe also informed Fleck that carrying a syringe is illegal in Philadelphia. *Id.* at 58:5–6. Fleck disagreed, offering to show Doe an executive order that had

legalized the possession of syringes in Philadelphia.  *Id.* at 58:7–12.  In response, Doe told Fleck to put her bag down because she was going to handcuff her.  *Id.* at 59:1–4.

Fleck immediately told Doe that she had a pre-existing shoulder injury and requested that Doe handcuff her in front of her body—not behind it.  *Id.* at 59:8–16.  But Doe handcuffed Fleck's hands behind her body.  *Id.* at 59:16–20.  Nicholson and Doe then drove Fleck to the police station.  *Id.* at 60:4–5.  There, they sat her in a chair, leaving her hands cuffed behind her back.  *Id.* at 60:13–16.  After Fleck complained several times about her shoulder pain, Doe loosened the handcuffs but kept them behind her back.  *Id.* at 60:16–23.   The officers then brought her to another room, where they seated her on a bench, cuffing her right arm to it.  *Id.* at 60:24–61:11.  After Fleck requested to use the bathroom, Nicholson untethered her from the bench, leading her by her still-cuffed arm to a cell, where she used the toilet facility.  *Id.* at 61:15–23.  Nicholson next handcuffed her back to the bench.  *Id.* at 61:24–62:6.

Shortly thereafter, Nicholson told her she was being charged with failure to disperse, and he guided her from the station and placed her back in the police car, keeping her in handcuffs the whole time.  *Id.* at 62:17–64:2.  He drove her to the courthouse, where she was arraigned by a judge who told her he would drop the charge if she returned in a month and had not been arrested again.  *Id.* at 65:4–67:3.  Fleck returned a month later, not having been arrested again, and the judge dropped the charge.  *Id.* at 66:24–67:4.

### C.     Arrest of Coulter Loeb

On July 14, 2011, Coulter Loeb, a student photojournalist from Ohio, was passing through Rittenhouse Square in Philadelphia on the way to a friend's house.  Loeb Dep. 7:14–17, 15:7–9, 16:24–17:16, Jan. 7, 2014.  Loeb was staying with the friend for a few months, and he was heading back to the friend's house after spending some time exploring Philadelphia and

6

taking pictures. *Id.* at 7:23–8:5, 14:18–15:9. As Loeb walked through the park, he noticed Officer George Gaspar and another officer interacting with a man and woman in what looked to be a stressful situation. *Id.* at 18:20–19:4. The man and woman appeared to be a feuding couple. *Id.* at 19:14–20:8. At that time, a different woman approached the officer who was with Gaspar and told him that a woman was injured on the other side of the park, prompting the officer to leave Gaspar and proceed there. *Id.* at 22:1–12.

Loeb followed the officer to the other side of the park, where he snapped pictures of him helping the woman, but he soon grew bored and returned to Gaspar's location. *Id.* at 22:7–13. When he returned, the man who was fighting with the woman walked away, leaving only Gaspar and the woman. *Id.* at 22:13–16. Loeb photographed this scene. *Id.* at 44:14–22. The woman then picked up her things and started to walk out of the park, accompanied by Gaspar. *Id.* at 22:13–18, 23:4–5. Loeb approached them as they were leaving and asked Gaspar if he could take a picture of the woman. *Id.* at 22:18–21. Gaspar told Loeb he could not take pictures of her until he was done escorting her from the park. *Id.* at 25:14–18. Loeb acquiesced but followed them as they left the park, waiting for Gaspar to leave so he could take the woman's picture. *Id.* at 25:20–26:5.

Noticing that Loeb was following them, Gaspar turned and confronted Loeb, putting his face inches from Loeb's and intentionally bumping Loeb's chest. *Id.* at 26:6–28:1. He next told Loeb three times to stop taking pictures and walk the other way. *Id.* at 28:7–8. Loeb refused each command to leave, so Gaspar grabbed Loeb, handcuffed him, and took him in a police car to the station. *Id.* at 28:7–14. After being at the station for about an hour, Loeb was charged with interfering with a police investigation and released. *Id.* at 68:4–69:1. His arraignment was set for the next day, but he was turned away at the door because he had his camera with him,

7

delaying his actual arraignment until two weeks after the incident. *Id.* at 69:19–71:9. At his arraignment, he pleaded not guilty, though he never returned for a trial because his charges were dropped. *Id.* at 68:18–20, 71:6–14.

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that could affect the outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Roth v. Norfalco, LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (citations omitted) (internal quotation marks omitted). To establish the existence or absence of a genuine dispute as to any material fact, a party must "cit[e] to particular parts of materials in the record" or "show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).

"In evaluating the motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted) (internal quotation marks omitted).

**III.    Discussion**

 **A.    Plaintiffs' First Amendment Retaliation Claims and Qualified Immunity**

 Plaintiffs allege violation of their right under the First Amendment as applied to the states by the Fourteenth Amendment to be free from arrest as retaliation against them for engaging in constitutionally protected expressive activity.  On the plaintiffs' First Amendment retaliation claims, the defendants all seek summary judgment based on qualified immunity.  Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  In evaluating qualified immunity claims, the court determines (1) whether the officer's conduct violated a constitutional right; and (2) if so, whether the right was clearly established at that time.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

 Under the first *Saucier* step, the analysis is whether the police officers retaliated against the plaintiffs for engaging in activity protected by the First Amendment.  *See Anderson v. Davila*, 125 F.3d 148, 160 (3d Cir. 1997) ("[A]n individual has a viable claim against the government when he is able to prove that the government took action against him in retaliation for his exercise of First Amendment rights.").  To establish this claim, the plaintiffs must show "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."  *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).  A defendant may defeat this claim "by showing that it would have taken the same action even if the plaintiff had not engaged in the protected activity."  *Id.* (citation omitted).

For the second *Saucier* step, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* at 201. The right thus cannot be cast at a "high level of generality"; "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004); *Saucier*, 533 U.S. at 202. While this does not mean that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful," the unlawfulness of the police officer's action must be apparent "in the light of pre-existing law." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). That is because qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

As originally formulated, the *Saucier* two-step inquiry was an inflexible procedure that required district court judges to address each step in sequential order. *Saucier*, 533 U.S. at 200. Today, however, district courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Bayer v. Monroe Cnty. Children & Youth Servs.*, 577 F.3d 186, 191–92 (3d Cir. 2009) (quoting *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The Supreme Court empowered district courts to deviate from the originally rigid process because "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. at 242.

The court here analyzes both steps only with respect to Nicholson and Doe's qualified immunity defense against Fleck, and it denies their motion for summary judgment based on that analysis. For Killingsworth's and Gaspar's qualified immunity defense against Montgomery and Loeb, respectively, the court considers only the second *Saucier* step, concluding that the constitutional right asserted by Montgomery and Loeb was not clearly established in this jurisdiction at the time of their arrests. The court therefore grants summary judgment to Killingsworth and Gaspar on this issue because they are entitled to qualified immunity on the First Amendment retaliation claims.

### 1.    Nicholson and Doe's Qualified Immunity Defense Against Fleck

The court denies Nicholson's motion for summary judgment that is based on qualified immunity.

### a.    Constitutional Right

Starting with *Saucier*'s first step, the court examines whether Fleck has alleged facts sufficient to show that Nicholson violated her constitutional right with his actions that day. Under Fleck's version of the facts, which the court adopts for summary judgment, she alleges that she was arrested and cited for peacefully observing and criticizing Nicholson and Doe while they were performing their duties as police officers in public. The threshold issue is whether her alleged facts are enough to show that she engaged in a protected activity.

Peaceful criticism of a police officer performing his duties in a public place is a protected activity under the First Amendment. As the Court established in *City of Houston, Texas v. Hill*, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." 482 U.S. 451, 461 (1987). This type of speech is necessary to protect and preserve because "[t]he freedom of individuals verbally to oppose or challenge police action

without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462–63.

This protection, however, is not absolute. Certain types of speech lose the First Amendment's protection, mostly because they form "no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 572 (1942); *see also City of Houston*, 482 U.S. at 461 ("Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." (alterations in original) (citation omitted)).

The category of fighting words, for example, is "an extremely narrow" category of unprotected speech. *Johnson v. Campbell*, 332 F.3d 199, 212 (3d Cir. 2003). To qualify as fighting words, the "words must do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'" *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 409 (1989)). When the words are aimed at police officers, this category is even narrower "because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." *City of Houston*, 482 U.S. at 462 (internal quotation marks omitted) (quoting *Lewis v. City of New Orleans*, 415 U.S. 130, 135 (1974) (Powell, J., concurring)); *see also Johnson*, 332 F.3d at 215 (holding that plaintiff's reference to his arresting officer as a "son of a bitch" was protected speech).

12

Another unprotected, or at least less protected, category of expression is speech that obstructs a police officer's investigation or jeopardizes a police officer's safety.  In *Colten v. Kentucky*, the Court held that the Kentucky state police did not violate the plaintiff's First Amendment rights when it cited him for disorderly conduct for speaking to a police officer who was issuing his friend a traffic citation and then refusing to leave the area.  407 U.S. 104, 109 (1972).  The plaintiff, Colten, was traveling as part of a procession of six to ten cars when a state policeman pulled over his friend.  *Id.* at 106.  Colten tried to talk to the police officer about the citation the officer was issuing his friend.  *Id.*  Other police officers on the scene testified that they asked Colten to leave at least five times, but Colten refused, telling them that he intended to stay and see what might happen.  *Id.* at 106–07.  Colten, on the other hand, alleged that he told the officers that he wanted to leave but only after he made transportation arrangements for his friend, who now could not drive.  *Id.* at 107.  Either way, the police arrested him and cited him for disorderly conduct.  *Id.*

Colten argued that "in seeking to arrange transportation for [his friend] and in observing the issuance of a traffic citation he was disseminating and receiving information."  *Id.* at 109.  But the Court disagreed, finding that his "conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment."  *Id.*  According to the Court, the "officers were entitled to enforce [the traffic laws] free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction."  *Id.*  The Court also focused on the inherently dangerous nature of the situation, stating that "the police had cause for apprehension that a roadside strip, crowded with persons and automobiles, might expose the entourage, passing motorists, and police to the risk of accident."  *Id.*  Under

13

these circumstances, the Court held that Colten "had no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time." *Id.*

For determining whether an activity is protected by the First Amendment, *Colten* thus distinguishes between an activity that obstructs an investigation or endangers the officer and one that involves peacefully observing and criticizing a police officer from a safe distance. Speech and conduct that obstructs a police investigation or enhances the danger in an already precarious situation has little social value when compared to the state's interest in public order. *See id.* at 111 ("Individuals may not be convicted under the [disorderly conduct] statute merely for expressing unpopular or annoying ideas. The statute comes into operation only when the individual's interest in expression, judged in the light of all relevant factors, is 'miniscule' compared to a particular public interest in preventing that expression or conduct at that time and place."). But peaceful criticism of a police officer that neither obstructs an investigation nor jeopardizes a police officer's safety has strong social value, serving as a valuable check on state power, and is therefore protected under the First Amendment. *See Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."). In short, "one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." *Norwell v. City of Cincinnati, Ohio*, 414 U.S. 14, 16 (1973).

Applying these principles to Fleck's version of the incident, the court concludes that she has alleged facts sufficient to show that she engaged in a protected activity that day. She came across a situation that she perceived as involving a potential abuse of police power: Nicholson was standing over an unarmed, semi-conscious man, aggressively pointing his baton at him. She

14

remained at the scene but did not obstruct his investigation.  Indeed, she complied with both of Nicholson's commands to back up, at which point she was about ten to fifteen away from him.  Although she then refused his command to leave the scene, the reasonable inference is that he instructed her to do so only because she told him she was going to observe him and asked for his name and badge number.

She also did not jeopardize Nicholson's safety: he was investigating an unarmed, semi-conscious man who was slumped over on a stoop.  The only potential danger in this situation was the syringe at the man's feet, but it was capped.  And none of her words could be construed as fighting words.  She offered only to help, and when that offer was rebuffed, she criticized the way Nicholson was handling the situation and calmly requested his name and badge number.  Her only words spoken to Doe were similarly innocuous: she told Doe that she was incorrect in telling her that it was illegal to have a syringe in Philadelphia.  Given these alleged circumstances, Fleck has established for purposes of this motion that she was peacefully criticizing the police officers while they were performing their duties on a public sidewalk, and she neither obstructed their investigation nor increased their risk of danger.  She has thus adduced facts sufficient to show that she was engaged in a protected activity that day.[3]

_____

[3] In contrast to Fleck's version, Nicholson alleges that Fleck exacerbated an already dangerous situation and obstructed his investigation.  He contends that when he woke up the man on the sidewalk and asked him where is identification was located, the man reached into his pocket, a move Nicholson viewed as potentially threatening.  Nicholson Dep. 62:14–63:1, Jan. 31, 2014.  He also alleges that Fleck's presence at the scene caused him to feel like the situation was "two on one" and that Fleck briefly stepped in between him and the man on his weapon side.  *Id.* at 74:20–75:2, 76:18–77:4.  He further claims that Fleck failed to comply promptly with his commands that she back up and give him space.  *Id.* at 76:10–77:2.  Although irrelevant for summary judgment purposes, this factual dispute may have to be resolved at trial.  These underlying factual disputes can be submitted to the jury through special interrogatories or a special verdict form.  In *Bennis v. Gable*, the Third Circuit gave the following example of an efficient jury instruction that resolves these factual disputes while also enabling the court to decide whether the activity is protected as a matter of law:

> Members of the Jury, it is up to you, as the sole finders of fact, to . . . . determine the nature of [the plaintiffs'] activity.  If you find that the plaintiffs' activity was of a political nature, that is, if you determine that the activity consisted of or included [plaintiffs' version of facts], then, Members of the Jury, I charge you as a matter of law that plaintiffs . . . engaged in protected first amendment

The relevant inquiry as to the next two factors is whether Fleck has alleged facts such that a rational trier of fact could find that Nicholson and Doe's retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights, and that there was a causal connection between the protected activity and the retaliatory action. *Lauren W.*, 480 F.3d at 267. Fleck has met this burden on both factors, so they can be submitted to a jury at trial.

Fleck has adduced enough facts to show that Nicholson's actions were sufficient to deter a person of ordinary firmness from exercising her rights. Fleck alleges that, after speaking with Nicholson, Doe told Fleck she was going to handcuff her. Fleck contends that she immediately informed Doe that she had a rotator cuff injury and asked if Doe could handcuff her hands in the front. Ignoring her request, Doe handcuffed Fleck's hands behind her back and took her to the police car, and Doe and Nicholson brought Fleck to the police station. She alleges that Doe and Nicholson kept her handcuffed for the entire time she was there despite her persistent complaints of pain. Taken as true, these actions are undoubtedly sufficient to deter a person of ordinary firmness from exercising her constitutional rights.

Fleck has also alleged enough facts to show a causal connection between her protected activity and these retaliatory actions. Under this factor, she must "prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Id.* Fleck was arrested, put in a police car, and taken to the police station, all within a very short time of engaging in her potentially protected activity. Accordingly, she has established an unusually suggestive temporal proximity between her protected activity and Nicholson and Doe's actions such that a rational trier of fact could conclude that one caused the other.

---

activity. If, however, you determine that the activity in which the plaintiffs engaged, if any, was [defendants' version of facts], then I charge you that you must find for the defendants.
823 F.2d 723, 731 n.6 (3d Cir. 1987).

### b.      Probable Cause

Fleck also argues that Nicholson lacked probable cause to arrest her, which is at the very least a logical and relevant consideration under this causation analysis.  *See Hartman v. Moore*, 547 U.S. 250, 265–66 (2006) (holding that a plaintiff cannot state a claim of retaliatory *prosecution* in violation of the First Amendment if probable cause supports the charge); *Reichle v. Howards*, 132 S. Ct. 2088, 2095 (2012) (declining to extend *Hartman*'s probable cause rule to retaliatory *arrests* but highlighting the "close relationship between retaliatory arrest and prosecution claims").  Probable cause to arrest is established "when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995).  In a § 1983 suit for damages, "the question of probable cause . . . is one for the jury"—that is, the pertinent consideration is whether a reasonable jury could find a lack of probable cause for Fleck's arrest.  *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998).

Fleck has satisfied this standard.  Nicholson arrested Fleck and charged her with violating 18 Pa. Cons. Stat. § 5502.  This statute states the following:

> Where three or more persons are participating in a course of disorderly conduct which causes or may reasonably be expected to cause substantial harm or serious inconvenience, annoyance or alarm, a peace officer or other public servant engaged in executing or enforcing the law may order the participants and others in the immediate vicinity to disperse.  A person who refuses or knowingly fails to obey such an order commits a misdemeanor of the second degree.

Fleck first highlights that she was not part of a group of three or more persons; the only other person at the scene was the semi-conscious man.  This fact is clearly not disputed. She also points to her version of that day's events —which portrays her as peacefully protesting Nicholson's actions from a safe distance while complying with his orders— as

demonstrating that she was not causing "substantial harm or serious inconvenience, annoyance or alarm."  Accepting her version as true, as the court must here, she has alleged facts sufficient for a reasonable jury to find that Nicholson lacked probable cause to arrest her for violating this statute.

In sum, Fleck has produced sufficient evidence from which a reasonable factfinder could find that Nicholson and Doe violated her constitutional right under the First Amendment.  Specifically, Fleck has adduced facts demonstrating that she engaged in a protected activity that day; that Nicholson and Doe's actions were sufficient to deter a person of ordinary firmness from exercising her rights; and that a causal connection existed between her protected activity and their retaliatory actions.

<strong>c.    Clearly Established</strong>

Moving to the second *Saucier* step, the court analyzes whether the right was clearly established at the time of the violation.  As stated previously, this analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.  In *Reichle v. Howards*, for example, the Court rejected the plaintiff's argument that the right at issue was a broad First Amendment right to be free from retaliation for engaging in a protected activity.  132 S. Ct. at 2094.  There, the plaintiff, Reichle, attended an event at which Vice President Richard Cheney greeted members of the public.  *Id.* at 2091.  When his turn came to greet Cheney, Reichle told him that his "policies in Iraq are disgusting" and touched Cheney's shoulder as Cheney was leaving.  *Id.*  Shortly thereafter, a secret service agent approached Reichle and asked him whether he had touched Cheney.  *Id.* at 2091–92.  Reichle falsely denied touching Cheney, so the agent arrested him.  *Id.* at 2092.

Reichle sued all agents involved under *Bivens*, claiming that he was arrested without probable cause and in retaliation for criticizing Cheney. *Id.* The agents moved for summary judgment based on qualified immunity. *Id.* On the second *Saucier* step, Reichle defined his clearly established constitutional right as the First Amendment right to be free from government retaliation for engaging in protected speech. *Id.* at 2094–95 Rejecting this overly broad characterization, the Court concluded that "the right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Id.* at 2094.

Here, too, the clearly established right cannot be the broad First Amendment right to be free from retaliation for engaging in protected speech, although the specific right in this case differs from the one the Court defined in *Reichle*. Unlike Reichle, Fleck asserts the constitutional right to be free from an arrest that is *not* supported by probable cause and was initiated in retaliation for peacefully criticizing a government official. This right was clearly established at the time of Fleck's arrest.

In *Losch v. Borough of Parkesburg, Pennsylvania*, the Third Circuit held that the plaintiff, Losch, had a clearly established right to be free from an arrest that lacked probable cause and was done in retaliation for his criticism of a police officer. 736 F.2d 903, 910 (3d Cir. 1984). Losch wrote a note to Officer Wilson of the Parkesburg, Pennsylvania, police department and had his son tape it to the front door of the police station. *Id.* at 906. In the note, Losch "strongly advise[d] [Wilson] to stop picking on [his] wife and children and accepting information which is not true." *Id.* He also warned Wilson about his "intentions of taking this matter before the County District Attorney's

Office and having [him] arrested for a number of offenses." *Id.* After receiving this note, Wilson charged Losch with two offenses: (1) "[h]arassment by communication or address" and (2) "[t]hreats and other improper influence in official and political matters." *Id.* at 906–07. The charges were eventually dismissed. *Id.* at 907.

Losch initiated a § 1983 action against Wilson and another officer in which he brought claims of Fourth Amendment malicious prosecution and First Amendment retaliation. *Id.* The officers invoked qualified immunity. *Id.* at 909. Analyzing the merits of Losch's claim first, the Third Circuit found that he had adduced enough facts for a jury to conclude the charges lacked probable cause and were instigated in retaliation for his protected First Amendment activity. *Id.* at 908–09. The Third Circuit thus concluded he could survive summary judgment unless that right was not clearly established at the time. *Id.* at 909.

The Third Circuit then rejected the possibility that the right was not clearly established. *Id.* at 909–10. Specifically, the Third Circuit asserted, "[T]here was no ambiguity in the law guaranteeing Losch's First and Fourteenth Amendment rights, or in the legal standard imposed by the Constitution on police officials." *Id.* at 910. Drawing on Supreme Court case law, the Third Circuit then stated that "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation 'for nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech." *Id.* (quoting *Norwell*, 414 U.S. at 16). It also concluded that an officer's arrest that lacks probable cause is a per se violation of clearly established law because police officers are required to know the probable cause requirement. *Id.* (citing *Trejo v. Perez*, 693 F.2d 482, 488 n.10 (5th Cir. 1982)). Given this existing law at the time of Losch's incident,

20

the Third Circuit held that Losch had a clearly established right to be free from an arrest and prosecution that lacked probable cause and were initiated in retaliation for his peaceful criticism of the police officer.  *Id.* at 909–10.

Under Fleck's version of that day's events, Nicholson and Doe thus violated clearly established law.  *Losch* was decided many years before the incident here, and it involved a constitutional right that almost mirrors the right asserted by Fleck in this case: the right to be free from an arrest that lacked probable cause and was initiated in retaliation for the peaceful observation and criticism of a police officer.  To be sure, the cases are not factually identical, but the rights invoked in both cases are close enough to establish that "existing precedent [has] placed the . . . constitutional question beyond debate."  *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011).

Moreover, the factual differences between the cases actually bolster this conclusion.  In *Losch*, for example, the plaintiff's form of criticism was a note taped to the police station's door.  Here, by contrast, Fleck observed and verbally criticized Nicholson from a public sidewalk, a forum that usually provides speech with strong First Amendment protection.  Indeed, unlike a police station, public sidewalks are "traditional public fora that time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."  *Boos v. Barry*, 485 U.S. 312, 318 (1988) (citation omitted) (internal quotation mark omitted).  Public sidewalks thus "occupy a special position in terms of First Amendment protection."  *Id.* (citation omitted) (internal quotation mark omitted).  So this difference would only heighten a reasonable officer's awareness that his actions were unlawful.  As a result, the right that Fleck asserts was clearly established because any reasonable officer

would have known that arresting her in this manner and for this reason violated her constitutional rights.

### 2. Killingsworth's Qualified Immunity Defense Against Montgomery and Gaspar's Qualified Immunity Defense Against Loeb

The court grants summary judgment in favor of Killingsworth and Gaspar on plaintiffs' First Amendment claim based on qualified immunity. Although Montgomery and Loeb urge the court to follow the two-step *Saucier* procedure and first "reaffirm the existence of a First Amendment right to observe and record public police activities in public," it declines to do so and addresses only the second *Saucier* step. That is because, unlike Fleck's case, these cases are ones "in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Pearson*, 555 U.S. at 236.

The court must first define the right at the appropriate level of specificity before analyzing whether it is clearly established. *See Saucier*, 533 U.S. at 202 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."). Under their version of the facts, which the court must adopt here, Montgomery and Loeb were arrested without probable cause while they were peacefully recording police officers performing their duties in public.[4] The dispositive inquiry here is thus whether they had a clearly established constitutional right to peacefully record police officers performing their duties in public.

This inquiry must be conducted "in the light of pre-existing law." *Hope*, 536 U.S. at 739. To conclude that this right was clearly established, the court need not find "a case directly on point," but it must be convinced that "existing precedent . . . ha[s] placed the

---

[4] Montgomery's videotaping and Loeb's photographing are categorized as "recording" activities for this analysis.

statutory or constitutional question beyond debate." *Al-Kidd*, 131 S. Ct. at 2083.  Existing

precedent is not limited to Third Circuit case law; case law from other circuits is relevant

in analyzing whether a reasonable officer would have known that his conduct violated the

Constitution.  *See Kopec v. Tate*, 361 F.3d 772, 777–78 (3d Cir. 2004) (discussing other

circuit case law in determining a right was clearly established).  Importantly, this inquiry

focuses only on the state of the law at the time of the arrests: January 23, 2011, for

Montgomery, and July 14, 2011, for Loeb.[5]  *See Kelly v. Borough of Carlisle*, 622 F.3d

248, 253 (3d Cir. 2010) ("[T]o decide whether a right was clearly established, a court

must consider the state of the existing law at the time of the alleged violation and the

circumstances confronting the officer to determine whether a reasonable state actor could

have believed his conduct was lawful.").

Relying on case law from the First, Ninth, and Eleventh circuits, Montgomery and

Loeb contend that this right was clearly established at the time of their arrests.  In

*Fordyce v. City of Seattle*, the Ninth Circuit endorsed a First Amendment right to film

matters of public interest.  55 F.3d 436, 439 (9th Cir. 1995).  Fordyce was videotaping a

protest for a local television production.  *Id.* at 438.  At the end of the protest, a police

officer arrested him for filming sidewalk bystanders without their permission and charged

him with violating a state privacy statute.  *Id.*  The charges were later dropped, and

Fordyce brought a § 1983 suit claiming a violation of his First Amendment right to gather

news and a Fourth Amendment violation for arresting him without probable cause.  *Id.*

---

[5] Montgomery claims in his response that his arrest occurred on January 23, 2012, even though he admits in the defendants' undisputed statement of facts that it occurred on January 23, 2011, alleges in his complaint that it occurred on January 23, 2011, and every other reference in the record to his arrest reflects the 2011 date.  Based on this incorrect 2012 date, he relies on *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011), as well as a 2012 Department of Justice memorandum, in arguing that this right was clearly established.  Because *Glik* and the Department of Justice memorandum came after Montgomery's arrest, the court disregards any reference to them he makes in support of his qualified immunity argument.

After he lost on summary judgment, Fordyce appealed to the Ninth Circuit. *Id.* at 439. In overturning the district court, the Ninth Circuit concluded that "a genuine issue of material fact does exist regarding whether Fordyce was assaulted and battered by a Seattle police officer in an attempt to prevent or dissuade him from exercising his First Amendment right to film matters of public interest." *Id.*

In *Iacobucci v. Boulter*, the First Circuit concluded that the plaintiff, Iacobucci, had a First Amendment right to film local government officials who were conducting public business in a public building. 193 F.3d 14, 25 (1st Cir. 1999). Iacobucci was arrested after he refused to stop filming several town commissioners while they were discussing the possible approval of an applicant's building permit. *Id.* at 18. Charged with disorderly conduct and disrupting a public assembly, Iacobucci spent four hours in custody, though the charges were later dismissed. *Id.* Iacobucci initiated a § 1983 suit in which he claimed false arrest and excessive force. *Id.* After losing in the trial court, the arresting officer appealed, contending he was entitled to qualified immunity on those claims. *Id.* at 21–22. Rejecting that argument, the First Circuit held that Iacobucci's "right to act as he did without being arrested for disorderly conduct" was clearly established at the time of his arrest. *Id.* at 24. In so holding, the First Circuit found that "Iacobucci's activities were peaceful, not performed in derogation of any law, and done in the exercise of his First Amendment rights." *Id.* at 25.

In *Smith v. City of Cumming*, the Eleventh Circuit held that the plaintiff, Smith, had a First Amendment right to photograph or videotape police conduct. 212 F.3d 1332, 1333 (11th Cir. 2000). Smith alleged that a police officer had harassed him and prevented him from filming his conduct in violation of the First Amendment. *Id.* at 1332.

24

Concluding that Smith had no First Amendment right to film the officer, the district court granted summary judgment in favor of the officer. *Id.* at 1333.   But the Eleventh Circuit disagreed, holding that Smith "had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct."  *Id.*[6]

Killingsworth and Gaspar, on the other hand, draw mostly on a Third Circuit case in arguing that the right to peacefully film police conduct was not clearly established at the time of the arrests.  In *Kelly v. Borough of Carlisle*, decided on October 4, 2010, the Third Circuit held that the plaintiff, Kelly, did not have a clearly established right to videotape a police officer during a traffic stop.  622 F.3d at 262.  Kelly was a passenger in his friend's car when a police officer pulled his friend over.  *Id.* at 251.  As the officer questioned Kelly's friend, Kelly began filming him from a small camera sitting in his lap.  *Id.*  After the officer noticed that Kelly was filming him, he demanded that Kelly turn over his camera to him.  *Id.*  Once he possessed the camera, the officer arrested Kelly, charging him with violating a Pennsylvania law against wiretapping.  *Id.* at 251–52.  The charge was later dropped, and Kelly sued the officer under § 1983, claiming violations of his First and Fourth Amendment rights.  *Id.* at 252.  The district court held that the officer had qualified immunity and granted summary judgment in his favor. *Id.*

On appeal, the Third Circuit agreed after conducting after an extensive examination of circuit and district court case law.  Because some of these cases "announce a broad right to videotape police" yet "other cases suggest a narrower right," the Third Circuit concluded that they "do not provide a clear rule regarding First Amendment rights to obtain information by videotaping under the circumstances presented here."  *Id.* at 262.  Specifically, the court held that

---

[6] Nevertheless, the Eleventh Circuit affirmed the district court because Smith had not shown that the officer violated this right.  *Id.*

"there was insufficient case law establishing a right to videotape police officers during a traffic stop to put a reasonably competent officer on 'fair notice' that seizing a camera or arresting an individual for videotaping police during the stop would violate the First Amendment. *Id.*

This case was decided by the Third Circuit just three months prior to the Montgomery arrest and nine months prior to the Loeb arrest.[7] Given this pre-existing and recent Third Circuit case law, Montgomery and Loeb did not have a clearly established right to record police officers while they were performing their duties in public. The case law at the time of their 2011 arrests did not establish a clear constitutional rule such that reasonable police officers would know that they were violating the constitutional rights of Montgomery and Loeb. *Cf. Wilson v. Layne*, 526 U.S. 603, 617 (1999) ("Given such an undeveloped state of the law, the officers . . . cannot have been expected to predict the future course of constitutional law." (internal quotation mark omitted)). Indeed, "[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Id.* at 618. Killingsworth and Gaspar are thus entitled to qualified immunity on the First Amendment retaliation claims asserted against them by Montgomery and Loeb, respectively.

## IV.    Conclusion

For the forgoing reasons, the court denies Nicholson and Doe's motion for summary judgment on Fleck's First Amendment retaliation claim, but grants summary judgment to Killingsworth and Gaspar on Montgomery and Loeb's First amendment retaliation claims.

An appropriate order follows.

---

[7] Whether the Third Circuit will eventually decide to follow what appears to be a growing trend in other circuits to recognize a First Amendment right to observe and record police activity is, of course, not for this court to decide, even if there are good policy reasons I adopt that change.